## WADDELL et al. v. EASTMAN KODAK CO.

### No. 1882.

District Court, W. D. New York.

Dec. 26, 1936.

Bechtold & Bernstein and Charles B. Bechtold, all of Rochester, N. Y. (Joseph G. Denny, Jr., of Philadelphia, Pa., of counsel), for plaintiffs.

Newton M. Perrins and George A. Gillette, Jr., both of Rochester, N. Y. (W. Brown Morton and H. Stanley Mansfield, both of New York City, of counsel), for defendant.

RIPPEY, District Judge.

The plaintiffs in this action, John Waddell and Alma Waddell, are copartners, trading as West Side Machine Works and as the Hill Manufacturing Company, and are citizens and residents of Kansas City, Kan.; the defendant Eastman Kodak Company is a corporation organized and existing under the laws of the state of New York with its principal office and place of business at Rochester, within the Western District of New York.

This is an action for damages for infringement by defendant of claims 1 and 6 of Hill patent No. 1,513,172, issued October 28, 1924, on an application filed January 6, 1923, which are claimed to cover "a novel apparatus and process for removing the noncondensible gases from a refrigeration system of the above mentioned character without either interruption to the operation of the system or waste of the refrigerating medium entrained with the gases."

The patent in suit was applied for by and issued. to Bert Eugene Hill. On or about January 20, 1931, the plaintiffs purchased said patent and, by such purchase, acquired all such rights under said patent as arise from infringing acts committed subsequent to such purchase.

In the art of mechanical refrigeration, there are, and were prior to the application for the Hill patent, two principal types of systems in use, commonly known as the "absorption system" and the "compression system." In whichever system used, while the refrigerating effect depends upon the rapid change of state of a substance from liquid to vapor, economical operation requires that such vapor be reconverted to a liquid refrigerant. In the "compression system," the change of the refrigerant, which may be ammonia, carbonic acid, sulphurous acid, and other substances, but preferably ammonia, from vapor to liquid form is accomplished by subjecting the vapor to an increase of pressure and a decrease of temperature with heat given off to the surrounding media. Air is substantially the only noncondensible gas found in this system. In the "absorption system," the refrigerant is mixed with water, heat is applied to the aqua ammonia solution and the ammonia gas is boiled off at high pressure and then cooled. The testimony indicates that the two systems are identical in purpose but require different apparatus to accomplish the desired result. They have the single difference in mode of operation described in this way by Dr. Free: "In the compression system, the change from low pressure ammonia gas to high pressure ammonia gas is produced by a compressor, whereas in the absorption system the change from low pressure ammonia gas to high pressure ammonia gas is produced by a combination of a water absorber and a boiler, or, sometimes called a generator, a device which separates the ammonia gas from the aqua ammonia." The absorption system is less economical in operation. The heat and work involved in absorption is far in excess of that required in condensation.

The presence of noncondensible gases in either system lowers the economy of operation by increasing the power or work necessary to obtain the same refrigerating effect, and this fact has been known since long prior to the time when Hill made his application for the patent in suit. A practical effort had been made to remove air and other noncondensible gases from a refrigerating system for purposes of economy long prior to that time. The free discharge of noncondensible gases from the system to the atmosphere involved loss of ammonia vapor with which the noncondensible gases were entrained during the refrigerating cycle, and this involved a serious loss in the volume of active refrigerant and danger to persons around the plant. Prior to the introduction of the Hill method and apparatus for purging, an excess pressure of ten to fifteen pounds was considered the limit beyond which it would not pay to try to remove the residual noncondensible gases and air on account of the loss of ammonia gas with the noncondensible gases as they were purged, whereas with the Hill method and apparatus there is no economic limit to the amount of air and noncondensible gases that can be purged, and they can be purged until the system is free from such gases.

In both systems, the problem is, and was prior to the Hill patent, to economically separate the ammonia gas from the noncondensible gases (principally air in the low-pressure compression system operating in subatmospheric pressure, or air and hydrogen in the absorption system) so that the former may be returned to the system and the latter thrown off without danger and loss of the active refrigerant. In both systems, this operation is performed by a purger. Hill does not refer to the apparatus described in claim 1 as a "purger." He uses the term "separator." There is no distinction, however, in so far as this suit is concerned, between the meaning of the two terms. The term "purger" for an apparatus for removing air from its admixture with the gas in an ice machine is shown in Holden patent No. 190,036, issued April 24, 1877, illustrated in detail in the drawings and described in the specifications in the second column on page 2. There, the "purger consists of two vases or domes, 0 0', located one within

the other, and immediately above the receiver. The inner dome 0 opens at the bottom directly into the upper portion of the receiver, and is provided with a blow-off pipe, p, provided with a cock, while the outer dome 0' forms a closed annular chamber about the inner dome." Subsequent to the Holden patent and prior to the patent in suit, various other patents have issued on purgers for removing noncondensible gases from refrigerating systems, including Lanphier patent No. 768,-379, August 23, 1904; Friedmann patent No. 1,084,265, January 13, 1914; and Hirth patent No. 1,100,015, June 16, 1914. The engineers engaged in the practice of the art of mechanical refrigeration at and prior to the time Hill made application for his patent, however, discussed means and method of removing the noncondensible gases from the system without interruption to the operation of the plant and without waste of the refrigerating medium entrained with the gases. It had been necessary to shut down the system for some period of time, manual operation was required, and the process then employed involved a high element of risk to life and property. Hill seems to be the first to devise an apparatus and method that would overcome these objections to the apparatus and system and method then in use. That was a step far in advance in the art and of great value to those practicing the art.

The plaintiffs assert that the apparatus and method of the patent in suit must be limited to use in the compression system only. No such limitation appears in the specifications or claims. The patentee refers to systems, by which he may mean the only two principal systems in use. Nor does he limit the noncondensible gases to be removed to air. But Professor Motz, a widely known authority on mechanical refrigeration, testified that "the Hill patent has nothing to do with absorption. Absorption has nothing to do with the subject matter of the Hill patent." It is clear, and I find from the record in this case, that the apparatus and method covered by the claims of the Hill patent in suit could not be used, and were not suitable for use, in the low-temperature absorption refrigeration system which defendant used prior to 1923. The Hill method and apparatus are not usable in any system where an admixture of ammonia and water is found. The patent in suit must be limited to the compression system of mechanical refrigeration and is not anticipated by the Isbell-Porter purger or the system in which it was used by defendant prior to 1924.

From 1912 to June 1, 1924, the defendant operated at its plant in Rochester, N. Y., an absorption system for low-temperature mechanical refrigeration. Purger No. 1 (Exhibit H), purchased from the Isbell-Porter Company, was installed in this system early in 1913 and continued in use until about June 1, 1924 (see Defendant's Exhibit D-6-H). About the latter date, purger No. 2 (Exhibit K) was installed and is still in use. In September, 1924, purger No. 3 was purchased from Hill and installed by him in conjunction with defendant's engineers in defendant's system about May 1, 1926, and is still in use but not regularly since the purchase from the Connor Purger Company and installation of purger No. 4, known as the Connor Purger, about April 15, 1927. The Connor Purger is still in use. The Hill apparatus bore the serial number 483 and is alleged to embody the inventions of plaintiffs' patent 1,513,172 and to have been adapted for the practice of the process set up in claim 6. It bore the notice "Pat'd Oct. 28, 1924." Thus, in 1924, defendant's absorption plant was superseded by a compression plant operating at subatmospheric pressure for producing low-temperature refrigeration. Structurally, purgers Nos. 1, 2, and 3, except for variations in dimensions and details of design, are identical. Functionally, No. 1 differs from both Nos. 2 and 3. No. 1 cannot be used in the practice of the Hill method and cannot be used in a compression system at all. It is claimed that No. 2 is the infringing purger. Purgers 2 and 3 are interchangeable in the compression system. The change from the Isbell-Porter purger to the Hill method (purgers Nos. 2 and 3) did not involve mere substitution. It involved a totally different principle and method of operation and apparatus.

It first becomes necessary to differentiate purger No. 1 from Nos. 2 and 3, and this may be done on the testimony of Professor Motz, corroborated, in many vital respects, by the testimony of Dr. Free, and the differentiations below indicated are my findings in that respect. Purger No. 1 may be conveniently here designated as an absorber, for it performs certain similar functions to the main absorbers in the system.

In the absorption refrigerating system used by defendant prior to 1924, the ammonia vaporized in the coolers was returned through pipes and spreader into the bottom of the absorption drums and there bubbled up through the weak aqua ammonia supplied from the generator and in which the ammonia vapor was intended to be absorbed to return it to the generator to be there vaporized by heat. These absorbers were provided with water-circulating cooling coils, and the pressure in the absorbers was below atmospheric, hence foul gases could not be vented directly from such absorbers because they were under vacuum.

Defendant's purger No. 1 was an additional absorber added to the refrigerating system and having the same type of shell, the same type of gas supply pipe and spreader, the same water-cooled coils, and the same amount of aqua ammonia in its bottom as did the main absorbers. The weak aqua to supply the added absorber (purger No. 1) came from the generator just as did the weak aqua for the main absorbers, and there is no evidence that the temperature or concentration of the weak aqua in the added absorber (purger No. 1) differed from the temperature or concentration of the weak aqua in the main absorbers; and the gases were bubbled up through the ammonia and it was intended to and did absorb the ammonia into water or weak aqua by molecular or chemical action in the added absorber (purger No. 1) exactly the same as was done in the main absorbers.

The only difference between the added absorber (purger No. 1) and the main absorbers was that the pressure in the added absorber (purger No. 1) was higher than the pressure in the main absorbers so that gases which passed through the aqua could be discharged periodically through an open vent, instead of having a vacuum within the shell which would draw in outside air, as would occur with absorbers operating under subatmospheric pressure. The added absorber (purger No. 1) could not be run continuously, and involved a purely batch operation for venting foul gases when it was cut off by hand operation from the rest of the system.

In the Hill purger the maintenance of constant pressure and temperature in the liquefied ammonia column produces constancy of condensation of ammonia vapor therein. In the operation of the purging absorber (purger No. 1) both the pressure and the concentration of aqua ammonia varied and these variations affected the absorption of ammonia gas in the aqua ammonia and there was no constancy of absorption. Neither the Hill purger No. 3 nor purger No. 2 could be substituted for the absorbing purger (purger No. 1) in the absorption system, nor could the purging absorber (purger No. 1) be substituted for the Hill purger or purger No. 2 in a compression system.

The Hill purger and method differs from the Isbell-Porter purging absorber (purger No. 1) in the following respects:

(1) Hill uses a column of refrigerating fluid. Purger No. 1 did not use a refrigerating fluid, for aqua is not a refrigerating fluid.

(2) Hill introduces gas from the high side of a compression system at relatively low temperature. In the operation of purger No. 1 gas was taken from the low-pressure side of an absorption system, heat was added by compression, and it was introduced in the purging absorber at comparatively low pressure and high temperature due to such added heat of compression.

(3) In the Hill purger the cooling coil and anhydrous ammonia column merely has to take out of the ammonia gas the heat of condensation. In purger No. 1, the cooling coil and aqua ammonia had to take out the heat of absorption, which is several hundred thermal units in excess of the heat of condensation for each pound of ammonia.

(4) In the Hill purger the temperature and pressure are such that, if ammonia should pass through the anhydrous liquid, it is condensed and salvaged because the conditions are below the condensing point. In purger No. 1 some ammonia gas passing through the aqua passed out with the air and was wasted, for the temperature and pressure were away above its condensing point.

(5) In the Hill purger the air and anhydrous do not act electrolitically or chemically to produce foul gas. In purger No. 1 the aqua and other substances react electrolitically and chemically to produce foul gases.

(6) In the Hill purger the gas and air are taken from the high-pressure side of the refrigerating cycle, where the volume is less per unit of weight, and no additional energy is required for operating the purger. In purger No. 1 the gas and air

were taken from the low-pressure side, where their volume must be largest per unit of weight, and energy must be expended in pumping them and compressing them to a pressure suitable for entering the purging absorber.

(7) In the Hill purger the pressure and temperature are such that the bubbles are of minimum size and maximum weight and as the bubbles are smaller they ascend slowly and make the maximum surface contact with the anhydrous per unit of weight of gas. In purger No. 1 the temperature and pressure conditions were such that the bubbles are of larger size, rise rapidly and have a minimum of surface contact of gases with aqua per unit of weight of the gases. In the Hill purger the bubbles rise slowly and hence do not tend to break through the surface of the bath. In purger No. 1 the bubbles rise rapidly and hence tend to break through the surface of the bath and are lost.

(8) The Hill purger works uniformly. With purger No. 1 the aqua ammonia is introduced in a weak condition which, due to absorption of ammonia vapor, becomes stronger and must be removed from the machine; otherwise it becomes inoperative. The Hill purger is a continuously operating machine; the purger No. 1 operates intermittently.

(9) In the Hill purger the column of anhydrous does not change its characteristics and efficiency is constant. In purger No. 1 the column of aqua continuously changes its characteristics from weak to a strong solution and its efficiency is constantly varying, which would require constant attention. The addition of condensate to the mother liquid as in Hill makes no change in efficiency.

(10) In the Hill method operating at high pressures in the purger, the heat units given off in condensing ammonia gas from vapor to liquid in the bath are much less than the heat units that would be given off in condensing gas from vapor to liquid in the bath if the range of pressures were used that were present in purger No. 1, due to the fact that, the higher the pressure, the lower the latent heat of condensation.

(11) Purger No. 1 was inoperable with anhydrous, for, if anhydrous were substituted for aqua under purger No. 1 conditions, it would immediately flash into vapor and pass off.

In the patents disclosing the flooded condenser type of apparatus and method (illustrated by Shipley, 1,087,052, February 10, 1914; Shipley, 1,079,610, November 25, 1913), the method of purging was to cool the condenser and purge it while out of operation, it being impracticable to do so while the system was in service. The Shipley condensers do not involve any withdrawal of noncondensible gases and the salvaging of the refrigerant within the refrigerating cycle, and the operation is not continuous. None of the flooded condensers antedating the Hill patent permitted continuous operation of the purger within the refrigerating cycle, and none of them anticipate the Hill invention.

Much critical discussion in the industry and by engineers and authors of the faults of the refrigerating systems in use previous to the time of the filing of Hill's application took place. Hill disclosed his method and apparatus and it received attention and analytical discussion among those interested in the practice of the art between the date of filing of the application and the issuance of the patent. With much of this defendant's employees were familiar and they were unsuccessfully experimenting on their own account. Up until 1923 the elimination of excess pressure due to air in compression refrigeration systems was an acute problem. The record shows that others had repeatedly tried to solve such problem but none of them is shown to have succeeded. The defendant company, after its engineer, Mr. Cather, had heard the exposition of the Hill invention and, notwithstanding their alleged use of the absorbing purger (purger No. 1), deemed it necessary to resort to the York Ice Machinery Company for advice and instruction as to how to purge the air from a compression refrigeration system, and the York Ice Machinery Company, after extensive research, failed to give defendant any advice which was practicable. The evidence satisfies me that purger No. 2 was built and installed in defendant's system to avoid the faults of the previous condensers, and embodied the novel ideas of Hill.

A critical examination of the prior art patents does not disclose the invention of Hill as shown in patent No. 1,513,172. There is nothing here to indicate that the inventions disclosed in those patents of the prior art were successful or admitted of the successful adoption of the appara-

tus and method of Hill for the purposes stated, or solved the problems confronting the industry of economically salvaging the refrigerant and eliminating the noncondensible gases within the refrigerating cycle while the system was in continuous operation below atmospheric pressure. For this invention involving novelty and a substantial advance in the art, as demonstrated by its practice and by its success, the plaintiffs are entitled to protection and the incident rewards.

I find and conclude that claims 1 and 6 of Hill patent 1,513,172 are valid and infringed. A decree to that effect may be entered, with costs to plaintiffs. Edmund Clynes, of Rochester, N. Y., will be named therein as special master to take the account, and I appoint him for that purpose.

The foregoing will be deemed to constitute the findings of fact and conclusions of law in accordance with the provisions of Rule 70½ of the Equity Rules (28 U.S. C.A. following section 723).